UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH CAROLINA
AT BEAUFORT

CIVIL ACTION NO. 10-cv-01796-WOB

DARNELL MITCHELL                                        PLAINTIFF

VS.                        **MEMORANDUM OPINION**

SCANA CORPORATION                                      DEFENDANT

This is an action for long-term disability benefits governed by Section 502 of the Employee Retirement Income Security Act of 1974, 29 U.S.C. §§ 1132(a)(1)(B),(g).  *See* Doc. 33.  This matter is before the Court on the parties' stipulations and memoranda in support of judgment, and the administrative record ("A.R.") (Doc. 17).  The parties have stipulated that oral argument is not necessary to the Court's resolution of this matter.

### *Factual and Procedural Background*

**A.    Plaintiff Worked For 20 Years As A Meter Reader**

Plaintiff has a high school diploma and received vocational training in diesel mechanics.  A.R at 8.  He began working as a meter reader for Defendant in 1987, and participated in the SCANA Corporation Health and Welfare Plan ("Plan").  The Reed Group, Ltd. ("Reed") provides Defendant with case management and administrative services for the Plan.

The Plan offers long-term benefits when a medical condition "related to illness, injury or accident . . . permanently prevents [a participant] from performing one or more of the material and substantial duties of [his or her] occupation." A.R. at 109. After two years of long-term benefits under this "own occupation" provision, a participant must be unable to perform "any gainful occupation" in order to continue receiving benefits. *Id.* Because SCANA denied Plaintiff benefits under the "own occupation" provision, the relevant duties are those of his meter reader job.

According to Plaintiff, his job required him to walk and stand eight hours a day; sit for an unspecified amount of time while driving to meter locations; "constantly" bend and reach; and lift up to ten pounds. A.R. at 8. His other responsibilities were using unspecified "machines, tools, or equipment;" using "technical knowledge or skills;" and writing, reporting, and supervisory activities. *Id.* at 9. Dr. Steve McGown,[1] a general practitioner who was one of Plaintiff's treating physicians, reported that, "according to [Plaintiff's] employer, the job required Plaintiff to walk approximately fifteen miles a day." *Id.* at 12.

---

[1] The administrative record sometimes refers to Dr. McGown as "McGowan."

Plaintiff performed this work for Defendant for twenty
years and, at some point, he developed knee, low back, and neck
pain.  When he applied for benefits, Plaintiff indicated that
his knee and lower back problems began in December 1995, but
that, at least initially, these problems did not cause him to
change his job, hours of work, or attendance, and he "simply
worked with the pain."  *Id.* at 7.

Plaintiff stopped working on May 22, 2007.  He received
short-term disability benefits from June 22, 2007 through
November 21, 2007.  During that time, Dr. McGown's records noted
Plaintiff's various complaints of knee, back and neck pain,
including radiating pain, sprains, limb cramping, and a mild
tremor.  *See id.* at 12-22, 75, 82.

**B.   Summer 2007 – Treatment By Dr. McGown, Who Assumed
       Plaintiff Was Working; No Follow-Up With Testing Or
       Neurological Consultation**

On May 23, 2007, Dr. McGown wrote Plaintiff an excuse from
work for May 22 through June 3, 2007.  He did not provide a
medical reason for the excuse, and Reed asked him for
information about Plaintiff.  *See id.* at 24, 71.  Dr. McGown
responded that no condition rendered Plaintiff wholly unable to
function.  He indicated, however, that Plaintiff was suffering
from knee and low back pain, which he was treating with
medications, and that this pain impacted Plaintiff's ability to
stand, walk, bend, twist, squat, climb, and use his feet or

legs.  Conversely, the pain did not impact Plaintiff's ability to use his arms and hands.  Dr. McGown stated that he expected Plaintiff to return to a "partial" level of functioning by the week of May 28, 2007, and to reach "maximum medical improvement" as of the week of June 4, 2007.  I*d.* at 24.

On June 4, 2007, however, Dr. McGown submitted an "attending physician's statement" to Reed that extended Plaintiff's estimated return to work date to June 11, 2007.  I*d.* at 73.  He stated that Plaintiff's condition "will not . . . continue to impact his [] ability to perform all of the essential functions" of his position, but that, in the interim, Plaintiff could only perform "1 to 3 hours" of standing, walking, sitting, or driving.  *Id.* at 74.  In a separate letter, Dr. McGown advised that he had prescribed Plaintiff analgesics, muscle relaxers, and oral steroids to help alleviate his back and knee pain; that he did not expect Plaintiff's disability to be permanent; and that he would pursue more aggressive treatment "if his condition warrants."  *Id.* at 72.

Plaintiff did not return to work on June 11, 2007, and Dr. McGown saw Plaintiff three times before his period of short-term disability ended.

On June 11, 2007, Plaintiff had a follow up appointment with Dr. McGown and told him that his "back pain and knee pain are improved on Naprosyn," but also that he has "some buttock

pain radiating down to the top of his leg [and] some neck pain with radiation and periodic numbness in his left little finger." *Id.* at 64. Dr. McGown assessed Plaintiff with knee pain, back pain, neck pain, "other" sprains, ostheoartrhosis, and possible radiculopathy. *Id.* Dr. McGown prescribed Plaintiff medication and referred him to a neurologist and for lab tests. *Id.* at 64-65.

On July 19, 2007, Plaintiff again saw Dr. McGown, who noted that he had previously referred Plaintiff to a neurologist and that Plaintiff was "in less pain with examination." *Id.* at 19-20. He ordered an x-ray of Plaintiff's cervical spine, but that test was not performed. *Id.* at 21.

As of August 20, 2007, Dr. McGown noted that he was "unaware [that Plaintiff] was completely not working;" thought Plaintiff would have seen a neurologist "long ago;" thought "further testing would have taken place before now;" and noted "labs [were] never done." *Id.* at 18. He believed Plaintiff "might as well have physical therapy and ortho" and thus referred Plaintiff to an orthopedist and to physical therapy. *Id.*

**C.    Late August 2007 – When Reed Inquires About Plaintiff's Status, Dr. McGown Initially Releases Him For Full Duty, But Rescinds That Decision Pending Evaluation By Neurologist**

On August 22, 2007, Reed contacted Dr. McGown by fax, inquiring whether he had cleared Plaintiff to resume full duty, and, if not, then "what is the medical reason he needs to remain on restricted duty." *Id.* at 62.  Handwritten notes in the margin of the fax, dated August 30, 2007 and September 6, 2007, state " —see prior notes, —may resume full duties as far as I'm concerned, —referred." *Id.* at 62.  According to Reed, this was Dr. McGown's release, which he later rescinded pending an evaluation by "Neurology and Pain Management." *Id.* at 82.

Reed contacted Plaintiff by letter, dated August 22, 2007, and advised that his "current disability status may cause [him] to have an interest in applying for benefits under the LTD provisions" of the Plan.  *Id.* at 3.  It further advised him that he should complete an application if he was interested in seeking such benefits, and that all of his treating physicians would be required to submit a "current diagnosis [and] complete medical records." *Id.*

**D.    Fall 2007 – Plaintiff Undergoes Knee Surgery In September, And The Orthopedist Releases Him To Full Duty As Of Early November 2007**

On August 29, 2007, Plaintiff saw orthopedist Dr. Theodore Koreckij, who performed "debridement arthroscopy" knee surgery

on September 18, 2007.  *Id.* at 44.  Dr. Koreckij saw Plaintiff

for follow up on October 17 and November 7, 2007, noting after

the latter visit that Plaintiff "has no further swelling in the

knee," although he still had some "subjective soreness."  *Id.*

Although Plaintiff told Dr. Koreckij that he "didn't feel that

he could do his regular duties," Dr. Koreckij states in his

notes: "At this point, patient, I suspect could probably go back

to his regular duties though his endurance may still be somewhat

impaired."  *Id.* at 43.

Dr. Koreckij wrote to Dr. McGown on December 5, 2007,

summarized his surgical findings and procedures, summarized the

post-operative visits that revealed no complications, and

relayed his conclusion that Plaintiff could return to work:

> [H]e has no further swelling in the knee.
> He still had some subjective soreness, but
> his range of motion was preserved. **At this
> time, I have not scheduled him for an office
> follow up and believe that he should be
> capable of returning to his regular duties
> to tolerance.**

*Id.* at 44 (emphasis added).

Dr. Koreckij relayed the same opinion to Reed in an

"Attending Physician's Statement" dated November 9, 2007, in

which he diagnosed Plaintiff with "[L]eft knee internal

derangement syndrome, and concluded that Plaintiff was

"ambulatory" and "improved;" suffered a "slight limitation of

function;" retained the capability to perform "light manual

activity (15-30%);" and was not "totally disabled" from the job
he had performed or "any other work." *Id.* at 4-5.

### E. Plaintiff Visits Dr. McGown In Late November And Applies For Long-Term Benefits

Meanwhile, Plaintiff saw Dr. McGown on November 26, 2007.
Dr. McGown's notes reflect that Plaintiff was regularly
exercising "[four times] a week or more" by "walking or other
light activity." *Id.* at 13. *See also id.* at 16 (same, 8/20/07
visit); *id.* at 19 (same, 7/19/07 visit). He needed no
assistance with activities of daily living such as dressing,
bathing, shopping, preparing meals, "walk[ing] without
assistance," performing household chores, getting in and out of
bed. *Id.* at 1. *See also id.* at 17 (same, 8/20/07 visit); *id.*
at 20 (same; 7/19/07 visit).

At this visit, Plaintiff complained of "acute discomfort."
*Id.* at 13. Up to this point, Dr. McGown had been unaware that
Plaintiff underwent "knee surgery and physical therapy," and he
learned that Plaintiff "apparently missed appointment with
neurology and did not reschedule." *Id.* at 13.

Dr. McGown's objective assessment found Plaintiff to be
"[w]ell appearing, well nourished, in no distress," as well as
"[o]riented x3, normal mood and affect." *Id.* at 14. His
"[r]eview of symptoms [proved] negative," with the exception
that, while Plaintiff had "no loss of grip strength," he did

have "pain in [his] upper back, neck and arms" that was "worse with neck movement" and "apparent radiation." *Id.*

Dr. McGown assessed Plaintiff with a cervical spine condition, neuropathy, and osteoarthritis. He gave Plaintiff a steroid injection and steroid tablets to take for five days, and referred him to a neurologist for pain management. As he had done earlier in the summer, Dr. McGown prescribed Plaintiff muscle relaxers and pain relievers.

The same day, Plaintiff applied for long-term disability benefits. *Id.* at 9. Plaintiff did not mention anything about being unable to work due to the effects of his medication or the upper body pain he mentioned that day to Dr. McGown. Instead, the only basis for his application was "left knee surgery" and "lower back problems." *Id.* at 7. In contrast to Dr. McGown's contemporaneous notes that showed that Plaintiff reported no restrictions in his daily activities, Plaintiff asserted in his application that he engaged in no household, recreational, or other activities such as driving or riding a bus, and that he engaged in "very little" socializing "due to his knee and back pain." *Id.* at 9.

**F.  McGowan's December 5, 2007 Letter Disagrees With Dr. Koreckij's Position That Plaintiff Can Return To Work**

On December 5, 2007, Dr. McGown prepared a "Letter to Disability."  The letter stated in full:

> Mr. Mitchell returns today at our request. **We have been asked by the Reed Group and his employer to provide an update of his status so that disability can be obtained.  While here, he shed some light on the history of his treatment.**
>
> He has a history of low back, neck and knee pain, for which he was first seen in May of this year.  He has worked on a job which, according to his employer requires him to walk up to fifteen miles per day.  He apparently has been doing this for about twenty years and has likely contributed to his present state.  However, he himself did not directly attribute this to his job, and he was not seeking workmen's compensation. From the time he was first seen, he was given pain medications, but the ones which seemed to help him the most impaired his ability to perform his job safely.  In fact, he was sent home by his employer for his evident pain, which demonstrated his willingness to continue working.
>
> Early in the course of his care, he was referred to neurology for treatment of nerve-related pain and for evaluation of a mild tremor.  Through no fault of his own, the appointment was never completed, and had to be requested again at a later date.  I was never aware that he had kept the rescheduled appointment until today.  The second appointment was cancelled because of a[n] apparent scheduling conflict on the part of the provider.  When he was here last week, I believed that he had merely overlooked that appointment, so I made a referral to pain management.

He has also been referred to physical
therapy for back, neck and knee pain. His
knee pain continued to intensify and I
consulted orthopedic surgery. I found out
last week that surgery was performed on his
knee, and he did have physical therapy
following the operation. I never received
any progress notes from orthopedics until
today and I still have not [] received any
from physical therapy.

I believe that [Plaintiff] continues to have
genuine pain which keeps him from being able
to perform his duties. In light of the
newer information available to us, I
encourage him to seek long-term disability.
I have spoken with . . . the Reed Group . .
. and [the Human Resources department of
Plaintiff's employer] about this today.

*Id.* (emphasis added).

### G. After Neurologist Dr. Bettle's Initial Examination, But Before MRI Tests Results Are Completed, Dr. McGown Informs Reed That Plaintiff Is "Totally & Permanently" Disabled; Neurologist Subsequently Disagrees

On December 11, 2007, Plaintiff saw neurologist Dr. Norman

Bettle, another treating physician, for his complaints of "neck

and lower back pain, numbness to both hands," which Plaintiff

reported had persisted "for an unspecified time but at least

several years." *Id.* at 28. After a physical exam that revealed

normal results save for some "mild" symptoms, Dr. Bettle noted:

Suspect[ed] degenerative disc/spine disease
in cervical and lumbar region. Cervical
myelopathy may be present as general
hyperreflexia is seen. Sensory symptoms to
both hands may either be due to carpal
tunnel syndrome or C6 radiculopathies. [He]
will arrange for an MRI of the C and L spine
[and have Plaintiff visit] for an NCS/EMG of

> arms and possibly legs (depending on the
> results of the L spine MRI).  [He] offered
> [Plaintiff] to try either amitryiptyline or
> Cymbalta, both of which would help with
> depression and pain.  [Plaintiff] declined
> but will continue with his current
> medication regimen.

*Id.* at 29.  Per his handwritten notation, Dr. Bettle discussed the same with "Dr. McGown, though when he did so is not clear. *Id.*

The record does not reveal whether Reed was aware of Dr. Bettle's notes in December.  The record is also contradictory concerning whether Reed took action on Plaintiff's application in December.

A report by SCANA's Clinical Nurse Case Manager for Long Term Disability that contains Reed's subsequent recommendation, states that at the "December 2007 review, LTD decision was deferred pending outcome of evaluation by Neurology and pain Management."  *Id.* at 82.  However, the agenda and minutes from the "Administrative Committee For Long-Term Disability Benefits Under The SCANA Corporation Health and Welfare Plan" meeting, held on December 19, 2007, show that Plaintiff's application was among those reviewed.  *See id.* at 97-98.  The minutes state that the Committee reviewed Plaintiff's application and, after discussion, unanimously voted to deny it.  *Id.* at 98.

On January 2, 2008, Dr. McGown informed Reed that Plaintiff was totally and permanently disabled due to "radiculatis."  *Id.*

at 42.  The MRI tests conducted the next day, however, did not reveal any significant findings.  *Id.* at 30-33.  Dr. Bettle included these test results with his February 7, 2008 response to Reed stating that, while Plaintiff had not yet reached "maximum medical improvement," he was not "permanently disabled."  *Id.* at 27, 34-40.

## H.    Subsequent Review And Denial Of Application For Long-Term Benefits

According to the minutes from the SCANA LTD Committee Meeting of February 20, 2008, the Committee had deferred reviewing Plaintiff's application at its January meeting pending an independent medical exam.  *Id.* at 101.  The February 20 minutes state that the Committee reviewed Plaintiff's application and unanimously voted to deny it.  *Id.*

Reed's LTD Case Review of Plaintiff's application, dated February 20, 2008, states that, based on the medical evidence discussed above, Reed recommended that Plaintiff's application for long-term benefits be denied because the "medical documentation does not support his being permanently disabled from performing his own occupation."  *Id.* at 83.  It explains that, although Plaintiff "continues to complain of back and knee pain" and Dr. McGown diagnosed him with spinal stenosis and osteoarthritis, the "MRI's performed do not support these diagnoses."  *Id.* at 83.  In addition, whereas Dr. McGown's

initial assessment was that Plaintiff was not permanently

disabled, he gave a later opinion of a permanent disability

"without providing documentation to support this." *Id.*  In

contrast, the neurology results showed mild conditions and,

based on those results, Dr. Bettle was of the opinion that

Plaintiff was not permanently disabled.  *Id.*

The Committee notified Plaintiff of the denial by letter

dated the next day, and advised him of his appeal rights.  *Id.*

at 80.  This letter explained:

> Your claim for long-term disability benefits ha[s] been
> denied because the information you and your doctor provided
> does not give sufficient evidence that your condition meets
> the LTD plan's definition of *permanently* disabled.
> **Specifically, Drs. Koreckij and Bettle stated that you are
> not permanently disabled from performing one or more of the
> essential functions of your job.**

*Id.* (emphasis added).

Plaintiff retained counsel in July 2008, and appealed.  *Id.*

at 79.

Reed retained Dr. Vicki Kalen, a board-certified orthopedic

surgeon, to review Plaintiff's appeal.  By letter dated

September 3, 2008, she opined that Plaintiff was able to work

without restrictions.  *Id.* at 26.  She reached this conclusion

after reviewing the medical evidence, and "attest[ed]" that her

review did not "constitute a conflict of interest."  *Id.*

Specifically, she acknowledged Plaintiff's complaints of "neck,

back and left knee pain," but found "no objective findings on

repeated physical examinations, MRI's or any other testing that support any impairment." *Id.* She concurred with Drs. Koreckij and Bettle, whose opinions were that Plaintiff could return to full duty. *Id.* On September 18, 2008, Reed also recommended that the denial be upheld because there were "no objective findings to support disability." *Id.* at 76.

### *Analysis*

The parties do not dispute that the ERISA plan at issue here vests the plan administrator with "complete discretion" to "determine eligibility benefits." A.R. at 128. The "plan administrator" includes SCANA and its "designees." *Id.* at 107, 112-13, 127. As such, this Court reviews the decision to deny Plaintiff benefits under the "abuse of discretion" standard. *See Williams v. Metro. Life Ins. Co.,* 609 F. 3d 622, 629-30 (4th Cir. 2010) (citations omitted).

This standard is deferential and involves a two-part inquiry:

> Under the abuse-of-discretion standard, we will not disturb a plan administrator's decision if the decision is reasonable, even if we would have come to a contrary conclusion independently. . . . Thus, we may not substitute our own judgment in place of the judgment of the plan administrator. . . . To be held reasonable, the administrator's decision must result from a "deliberate, principled reasoning process" and be supported by substantial evidence.

*Id.* at 630.  See *also Evans v. Eaton Corp. Long Term Disability Plan,* 514 F.3d 315, 322-23 (4th Cir. 2008).

In assessing reasonableness, the Court is guided by eight nonexclusive factors:

> (1) the language of the plan;
>
> (2) the purposes and goals of the plan;
>
> (3) the adequacy of the materials considered to make the decision and the degree to which they support it;
>
> (4) whether the fiduciary's interpretation was consistent with other provisions in the plan and with earlier interpretations of the plan;
>
> (5) whether the decisionmaking process was reasoned and principled;
>
> (6) whether the decision was consistent with the procedural and substantive requirements of ERISA;
>
> (7) any external standard relevant to the exercise of discretion; and
>
> (8) the fiduciary's motives and any conflict of interest it may have.

*Williams,* 609 F.3d at 630.

"Substantial evidence consists of less than a preponderance but more than a scintilla of relevant evidence that 'a reasoning mind would accept as sufficient to support a particular conclusion.'"  *Whitley v. Hartford Life & Accident Ins. Co.,* 262 F. App'x 546, 551 (4th Cir. 2008) (quoting *Laws v. Celebrezze,* 368 F.2d 640, 642 (4th Cir. 1966)).

Plaintiff focuses first on Dr. Kalen's methodology and conclusion, noting that SCANA "employed" Dr. Kalen to conduct an independent review. Assuming that Plaintiff is implying that Dr. Kalen was not independent because SCANA paid her for her services, he gains no advantage from that observation. Any "conflict" on Dr. Kalen's part is no different from the conflict that already "exists in this case because [SCANA], as the plan administrator, has authority both to evaluate benefit eligibility and to pay benefit claims." *Frankton v. Metro. Life Ins. Co.,* 432 F. App'x 210, 216 (4th Cir. 2011) (citation omitted).

This Court considers that conflict "because of the administrator's financial incentive to deny coverage in its claims processing." *Id.* The presence of such a conflict of interest, however, "is but one factor among many," and does not change the applicable "abuse of discretion" inquiry above. *Williams,* 609 F.3d at 630-31. Moreover, courts have observed that hiring outside entities like Reed or physicians like Dr. Kalen can *mitigate* the impact of that inherent conflict. *See, e.g., Frankton*, 432 F. App'x at 216.

Plaintiff next argues that Dr. McGown's opinion that Plaintiff was totally and permanently disabled is "reliable." In support, he quotes the Supreme Court's decision in *Black and Decker Disability Plan v. Nord,* 538 U.S. 822, 834 (2003), in

which the Court noted that a plan administrator cannot

arbitrarily refuse to credit a claimant's reliable evidence,

including the opinions of a treating physician.

As the Fourth Circuit has noted, however, the Court in *Nord*

"declined to extend to ERISA benefits claims the treating

physician rule applicable in Social Security cases, under which

deference is due to the opinion of a claimant's regular treating

physician." *Four L. Coal Co. v. Director, Office of Worker's*

*Compensation,* 157 F. App'x 551, 555 (4th Cir. 2005) (citation

omitted). Specifically, *Nord* held that:

> Plan administrators, of course, may not
> arbitrarily refuse to credit a claimant's
> reliable evidence, including the opinions of
> a treating physician. But, we hold, courts
> have no warrant to require administrators
> automatically to accord special weight to
> the opinions of a claimant's physician; nor
> may courts impose on plan administrators a
> discrete burden of explanation when they
> credit reliable evidence that conflicts with
> a treating physician's evaluation. The
> Court of Appeals therefore erred when it
> employed a treating physician rule lacking
> Department of Labor endorsement in holding
> that Nord was entitled to summary judgment.

*Nord,* 538 U.S. at 834 (footnote omitted).

Next, Plaintiff asserts that Dr. Kalen conducted a

"piecemeal" review of the physical requirements of Plaintiff's

job and his medical records, "picking and choosing" among the

medical evidence. The Fourth Circuit has rejected a similar

argument, noting that "picking and choosing" is "just a

pejorative label for 'selecting,'" which does not render a decision unreasonable. *Evans v. Eaton Corp. Long Term Disability Plan,* 514 F.3d 315, 326 (4th Cir. 2008). That is, this Court is not concerned with selectivity -- "which is part of a plan administrator's job" -- but rather with an administrator's "wholesale disregard" of evidence in the claimant's favor. *Id.* (citation omitted).

There was no such "wholesale disregard" by the plan administrator here. All of the medical evidence came from Plaintiff's three treating physicians – McGown, Koreckij, and Bettle -- and the denial of benefits was based on the views of two of those physicians that Plaintiff was *not* permanently disabled. Objective criteria supported the views of Dr. Koreckij and Dr. Bettle. Dr. Koreckij performed surgery, saw the condition of Plaintiff's knee, repaired the damage he found, and monitored Plaintiff's recovery. Similarly, MRIs of Plaintiff's cervical and lower spine supported Dr. Bettle's view that nothing other than minimal changes had occurred and that Plaintiff required no further treatment.

The only physician who opined that Plaintiff was permanently disabled was Dr. McGown, his general practitioner. As the record reflects, however, Dr. McGown's opinion rested exclusively on Plaintiff's subjective complaints of continuing pain.

Moreover, Dr. McGown's early treatment of Plaintiff's knee and back found Plaintiff capable of returning to work. When Plaintiff persisted with complaints of pain, he referred him to specialists and Plaintiff underwent successful knee surgery. When Plaintiff complained of pain in his upper torso, Dr. McGown again referred him to specialists. Thus, at his last appointment where he examined Plaintiff, Dr. McGown's notes reflected that Plaintiff's symptoms were "negative, except as noted," and that his objective assessment was that Plaintiff was generally "in no distress," save for his complaints of pain in the upper part of his body. A.R. at 14. It was only after plaintiff decided to apply for long-term disability benefits that Dr. McGown changed his opinion.

This matter therefore in no way resembles a case where Plaintiff's treating physicians have uniformly found total disability and their finding is supported by objective medical evidence. *Cf. Cunningham v. Paul Revere Life Ins. Co.,* 235 F. Supp.2d 746 (W.D. Mich. 2002).

Where, as here, Plaintiff's own treating physicians are conflicted about his or her functional capacity to perform work, resolution of such conflicts is "well within the discretion conferred" to the administrator under the plan. *Mullins v. AT & T Corp.,* 424 F. App'x 217, 223 (4th Cir. 2011) (citation omitted). *See also Elliott v. Sara Lee Corp.,* 190 F.3d 601, 606

(4th Cir. 1999) ("[I]t is not an abuse of discretion for a plan fiduciary to deny disability pension benefits where conflicting medical reports were presented.") (internal quotations and citation omitted).  Indeed, under these circumstances, the Court cannot "join[] the fray [and] re-weigh[] the evidence."  *Evans*, 514 F.3d at 325.

The evidence shows that the records Dr. Kalen received included Dr. McGown's clinic notes, which would have included his letter opining that Plaintiff is fully and permanently disabled.  Her decision to reject that opinion, in light of the records and statements from Drs. Bettle and Koreckij and the subsequent MRI test results, is not arbitrary.

Plaintiff further faults Dr. Kalen for performing her medical review based on the record, rather than examining him herself, but he cites no authority that imposes such a duty on the independent medical reviewer.  The plan here does not obligate the administrator to perform an examination of the applicant.  Instead, the Plan places the burden of demonstrating a disability on the participant by way of medical records of treating physicians.  A.R. at 112-13.

Persuasive authority from the Fourth Circuit has addressed this situation and compels a rejection of Plaintiff's argument. *See Piepenhagen v. Old Dominion Freight Line, Inc. Employee Benefit Plan,* 640 F. Supp.2d 778, 792 (W.D. Va. 2009) (noting

that plan "in no way obligates" administrator to conduct an independent medical examination under any circumstances, even when the administrator questions or disagrees with the unimpeached opinions of claimant's treating physicians).

In addition, as *Piepenhagen* noted, "there is no *per se* rule in the law requiring that a plan administrator must conduct an independent medical examination before denying benefits." *Id.* at 792. Recent decisions from other district courts in the Fourth Circuit cite this language from *Piepenhagen,* rejecting such arguments as a matter of law. *See Bess v. Mut. of Omaha Ins. Co.,* No. CIV.A. 2:11-00143, 2011 WL 5858815, at *11 (S.D. W.Va. Nov 22, 2011); *Savoy v. Federal Exp. Corp. Long Term Disability Plan,* No. CIV.A. DKC 09-1254, 2010 WL 3038721, at *6 (D. Md. July 30, 2010).

Finally, the *Piepenhagen* Court noted that the "Fourth Circuit has found under similar circumstances that there is no duty for a plan administrator to develop any evidence that a claimant is not disabled (independent medical evidence or otherwise) before denying benefits." *Piepenhagen*, 640 F. Supp.2d at 793 (citing *Lucy v. The Macsteel Serv. Ctr.,* 107 F. App'x 318 (4th Cir. 2004)).

The plaintiff's failing in *Lucy,* not unlike here, was that he relied "solely on conclusory statements by [his] treating physicians [to show] that he was disabled." *Id.* (citing *Lucy,*

107 F. App'x at 321). The participant argued that the plan

administrator had an obligation to develop evidence indicating

that he could perform his job, but the Fourth Circuit rejected

that claim:

> Assuming a plan administrator has a duty to
> develop evidence in some circumstances, [the
> plaintiff] properly concedes that "to
> trigger this duty the claimant must first
> come forward with evidence of disability." .
> . . . A plan is under no obligation to
> develop evidence that the claimant is not
> disabled before denying benefits when (1)
> the plan imposes a duty upon the claimant to
> provide proof of disability at the
> claimant's expense; (2) the claimant is
> represented by a lawyer; (3) the claimant
> provides, on the one hand, medical records
> that indicate that his condition is
> improving and, on the other hand, conclusory
> physician statements that he is disabled;
> and (4) the plan informs the claimant's
> lawyer that he must submit more evidence of
> disability.

*Lucy,* 107 F. App'x at 322.

If the Fourth Circuit declined to require a plan

administrator to conduct an independent examination to gather

evidence under those circumstances, then this case presents an

even less compelling reason to do so. Here, the denial of

benefits did not rest on a lack of medical evidence. Rather,

the medical records from Plaintiff's almost seven months of

treatment simply did not objectively support his claim.

Thus, no Fourth Circuit law requires an independent

examination as a matter of law, and if the *Lucy* criteria apply,

the facts of this case do not require any such examination. *See Piepenhagen,* 640 F. Supp.2d 778 at 792-93.

Plaintiff's final argument is that some of the *possible* side effects of Plaintiff's medications are dizziness, headaches, drowsiness, light-headedness, and confusion, and that Dr. Kalen summarily dismissed Dr. McGown's finding that Plaintiff's medications can impair his ability to perform his job safely.  Plaintiff faults her for not mentioning Dr. McGown's observation or contacting him or Plaintiff to discuss it.

For the reasons just discussed, Dr. Kalen was under no obligation to conduct her own examination or otherwise supplement the record.  Equally dispositive of this argument is the fact that it is based on the *possibility* of side effects, not actual side effects suffered by Plaintiff.  A record that simply contains a doctor note that medication *may* cause side effects is not sufficient unless accompanied by objective evidence that the applicant actually experiences those effects. *Day v. Hartford Life Ins. Co.,* No. C/A 6:09-1041-HMH, 2009 WL 3617549, at *9 (D.S.C. Nov. 2, 2009).

Here, Plaintiff never mentioned side effects to his doctors or in his application for long-term benefits.  *See DiCamillo v. Liberty Life Assur. Co.,* 287 F. Supp.2d 616, 625 (D. Md. 2003) ("While a Liberty Life nurse assigned to DiCamillo's claim did

note the possibility of cognitive deficits from medication . . .

DiCamillo never raised the side-effects as a significant part of

his claim.  The focus of his benefits claim always remained on

the back problems he suffered.  Thus, Liberty Life did not abuse

its discretion in failing to give considerable weight to the

cognitive difficulties DiCamillo now asserts contributed to his

disabling condition.").

Thus, this Court is not at liberty to grant relief based on

Plaintiff's side effects argument.  *See Scott v. Eaton Corp.*

*Long Term Disability Plan,* 454 F. App'x 154, 160-61 (4th Cir.

2011).


Therefore, having reviewed this matter, and the Court being

sufficiently advised,

**IT IS ORDERED** that defendant is entitled to judgment as a

matter of law on plaintiff's claims herein.  A separate judgment

shall enter concurrently herewith.

This 18th day of May, 2012.



**Signed By:**

*William O. Bertelsman*

**United States District Judge**